[No. B157257. Second Dist., Div. Four. Mar. 7, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
BISMARK CEJA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1. and 2. of the Discussion.

**COUNSEL**

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General,

Marc J. Nolan and Jeffrey Hoskinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HASTINGS, J.—**

### INTRODUCTION

Appellant, Bismark Ceja, was charged with numerous crimes involving a number of different victims occurring at different times and locations. He pled not guilty and not guilty by reason of insanity (NGI). In the guilt portion of his trial he was convicted by a jury of all charges. His convictions include the following crimes: kidnapping to commit another crime (Pen. Code, § 209, subd. (b)(1));[1] forcible oral copulation (§ 288a, subd. (c)(2)); sodomy by use of force (§ 286, subd. (c)(2)); forcible rape (§ 261, subd. (a)(2)); sexual penetration with a foreign object (§ 289, subd. (a)(1)); carjacking (§ 215, subd. (a)); and second degree robbery (§ 211). The jury also found numerous enhancement allegations to be true. Some related to appellant's use of deadly weapons in connection with the crimes and some related to the kidnapping charges.

A new jury was later empanelled for the NGI portion of the trial. After the evidence had been presented, the trial court granted a motion in favor of the People, pursuant to section 1118.1, dismissing the special plea of NGI. The jury was then dismissed. Appellant was sentenced to 150 years to life plus four consecutive life terms in state prison, along with imposition of a restitution fine and a parole revocation fine.

Appellant's appeal addresses issues relating primarily to the NGI portion of trial. He contends: his attorney was ineffective in understanding, preparing for, and addressing the issues in connection with his NGI plea and defense; the trial court erred in denying appellant's request to represent himself during the NGI portion of the trial; the trial court erred in denying a continuance of the NGI phase so he could obtain an expert witness on the issue of sanity; and, as he characterizes the issue, the trial court erred in directing a verdict in favor of the prosecution. We conclude that appellant has failed to demonstrate counsel was ineffective; that appellant's request to represent himself was not timely made; that appellant has failed to demonstrate the court abused its discretion in denying the continuance; and that the court did not err in removing the issue of sanity from the jury. We affirm.

---

[1]All further references will be to the Penal Code unless otherwise noted.

## Statement of Facts

Because appellant does not essentially challenge his underlying guilt determination, we set out only a brief outline of the facts relating to the crimes.

On February 25, 1999, appellant came up behind Erika C. as she waited for a bus, pressed a knife against her side and ordered her into his car. Appellant drove for a period of time to a location where he stopped the car and forced her into a number of sex acts. Later, Erica was able to jump out of the moving car and escape. She ran to a nearby house, where she called the police and she reported the incidents. She ultimately identified appellant from police photos shown to her.

On September 12, 2000, appellant accosted Jinny H. as she was getting into her car at a local college. Appellant told her he had a knife and forced her into the passenger seat and drove to another location. At the new location appellant forced Jinny H. into a number of sex acts. He then drove to another location, again forcing Jinny H. into sex acts. He then ransacked her backpack, took her wallet and ATM card, and forced her out of the car. He drove away taking Jinny's car. Jinny was able to identify appellant from a photographic lineup. Some of Jinny's personal belongings were recovered from appellant's girlfriend after appellant was arrested.

On October 23, 2000, Sylvia P. accepted a ride from appellant. While he was driving, appellant forced Sylvia to perform a number of sex acts on him. He later stopped the car and forced Sylvia into more sex acts. When Sylvia asked if she could go, appellant allowed her to get out of the car. She later identified appellant from a photographic lineup.

On November 1, 2000, appellant rear ended Jin O.'s car. They each pulled over and exchanged information. When Jin began to get back in her car, appellant placed the blade of a blue box cutter to her throat and forced her into the passenger seat of her car. Appellant drove the car from the scene and threatened to kill her unless she gave him the PIN number to her bank account, which she did. He also forced Jin to perform sex acts on him and he fondled her while driving. Jin was able to jump out of the car at some point and escape. She later identified appellant from a photographic lineup. A blue box cutter and a check deposit slip of Jin's were each found in appellant's residence after he was arrested. A latent fingerprint from appellant was found on the deposit slip.

In each of the four separate incidents appellant had the women take off their shoes and socks and he either kissed their feet or sucked on their toes.

Appellant's girlfriend testified that appellant had a sexual interest in women's feet and that he liked to kiss or lick her feet.

Appellant did not testify during the guilt phase of the trial, but he did take the stand during the NGI portion of the trial. He testified that after graduating from high school he began using illegal drugs, mostly LSD. Within six months before his arrest he often blacked out at school, at work, and while driving, resulting in a number of traffic violations and being fired from his jobs. He could recall only two of the four women who charged him with the crimes and could not recall assaulting any of the women. With regard to the two he recalled, all he remembered was "waking up" with them pleading for him to release them, which he did. He did not know where he met them. Nor did he know why he would have kissed the feet or sucked the toes of the victims. In the abstract, he acknowledged that he knew it was wrong to use a weapon or force a person into doing a sexual act with him. In response to the prosecutor's series of questions regarding the specific crimes of which he was convicted, and whether he was aware these acts were wrong, appellant had the following exchange: "A. [Appellant] Of course I wouldn't do something like that. [¶] Q. Okay. So then you didn't do these things? [¶] A. Not consciously, no. [¶] Q. Well, you did it subconsciously, unconsciously, or what? [¶] A. I can't speak for the things I can't remember." He also denied making any statements to the detectives about any of the incidents.

Appellant's mother also testified on his behalf at the NGI phase. She believed that appellant was basically a normal person, neither violent nor abusive. She had no idea he was committing the crimes for which he was convicted. She did note that in his second year of college, in 1998 or 1999, he became forgetful, but he appeared to know the difference between right and wrong at the time. She could not believe that he committed the crimes of which he was charged and believed that if he did so he must have been "crazy or something else." On cross-examination, she admitted that it was her belief that anyone who committed the type of crimes with which her son was charged must be crazy.

The prosecution called Dr. Kaushal Sharma, a medical doctor specializing in forensic psychiatry. Dr. Sharma had examined appellant and concluded that despite the fact appellant had mental problems, he was not mentally ill at the time the crimes were committed. It was his belief that at the time the crimes occurred, appellant understood the nature and quality of his acts and understood the difference between right and wrong.

On cross-examination of Dr. Sharma, appellant's counsel, Mr. Poland, inquired whether appellant could have been acting under a "split personality" at the time of the crimes. Dr. Sharma responded: "Okay. Correction. Not

arguing with you, but when you used the word 'split personality,' there is no such term used in psychiatry. I don't know what it means. I know what people say on the street. He has a split personality. So a split personality, which is a street slang for meaning that he or she changes in mood, is not same as having a multi-personality disorder, which is not called that anymore, by the way, since 1994. Multiple personality disorder is a mental illness. . . . A split personality is—I don't know what it is. It's certainly not a mental disorder." Mr. Poland then inquired whether or not the recorded interview of appellant taken by the police demonstrated that appellant was operating under a multiple-personality disorder when he committed the various crimes. Dr. Sharma answered in the negative. He explained that in a true multiple-personality disorder the individual is unaware of the different personalities. Appellant's interview demonstrated just the opposite, that he was blaming his acts on his other personality, referring to himself in the "third person."

Mr. Poland also asked Dr. Sharma whether he had discussed "blackouts" with appellant. The following answer and exchange took place: "He never called them blackout[s], but I discuss[ed] with him what he called that he had, he had memory problems. I think that's the word he used. [¶] Q. There were parts of time that he couldn't account for because he didn't remember what had happened during those parts of time; right? [¶] A. The answer would be yes. He did say that. [¶] Q. And that didn't ring any bells with you as to maybe he had a personality disorder where there was another personality coming out during those blackout periods? [¶] A. No, just the opposite in the manner he described, and I'll be happy to explain. [¶] Q. Sure. Please. [¶] A. Yeah. And when he was—I asked him about each incident, and the first incident he—he described his memory throughout the event, how it started, how it went, and how it ended. [¶] And second and third event, in fact, he described the fourth event as the third, but now keeping that aside, at least two events he stated that he was—he recalls approaching the victim and either getting into, one case, in her car or getting her in his car, and then he doesn't remember anything, but it all came back to him two days later. That's what he says, came back to him two days later. [¶] That kind of description is not a description of multipersonality. If you have personality A and B, and B did it and you don't know about B, it doesn't come back to you in two days. [¶] So that's what he said. He said it came back to him in two days."

Detective Christopher Derry testified that during appellant's interview after his arrest, appellant was able to remember back to 1991, by referencing the Los Angeles Lakers' loss to the Chicago Bulls in the championship playoffs and a recent vote on marijuana. While appellant did have some

trouble recalling details of the various incidents, he was able to recall some facts about each of the four incidents and went into some detail about the various sexual acts involved, including that he had either kissed the feet of the victims or sucked their toes.

Further facts will be presented in connection with discussion of each of the issues raised on appeal.

DISCUSSION

1., 2.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *The So-called Grant of Directed Verdict*

Before 1978, California applied the so-called M'Naughton test in determining whether a defendant was insane in connection with a plea of NGI. The American Law Institute test was adopted for use in 1978. Proposition 8, which was enacted by an initiative measure approved by the voters on June 8, 1982, restored the M'Naughton test to California. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 12, p. 344.) The defense of insanity is addressed in section 25, subdivision (b). As pertinent, section 25, subdivision (b) states: "(b) In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact *only when the accused person proves by a preponderance of the evidence* that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (Italics added.)

■ "Insanity, under the California M'Naughton test, denotes a *mental condition* which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act. [Citations.] This is a factual question to be decided by the trier of fact. [Citation.]" (*People v. Kelly* (1973) 10 Cal.3d 565, 574 [111 Cal.Rptr. 171, 516 P.2d 875], italics added.)

"Insanity is a plea raising an *affirmative defense* to a criminal charge, although one that does not negative an element of the offense. The plea of not guilty by reason of insanity is one of the six kinds of pleas to an indictment or information. (Pen. Code, § 1016.) The statutes consistently

---

*See footnote, *ante*, page 1071.

refer to the plea as a 'defense.' Thus, Penal Code section 25, subdivision (b), refers to the 'defense' of insanity. [Citations.] . . . [¶] '[T]he issue at the insanity trial is not whether in fact the defendant has committed the act but whether or not he should be punished.' [Citation.] For this reason, we stated in an early case that it is not 'strictly accurate' to denominate an insanity plea a 'defense'; '[m]ore correctly it is a special plea to the effect that, assuming the [offense] to have resulted from the act of the defendant, he is not amenable to punishment under the law.' [Citation.]" (*People v. Hernandez* (2000) 22 Cal.4th 512, 522 [93 Cal.Rptr.2d 509, 994 P.2d 354].)

■ Based on the United States Constitution, the Sixth and Fourteenth Amendments, and the California Constitution, article I, section 16, appellant contends that it is error in a criminal action for a trial court to direct a verdict in favor of the prosecution. ■ "[A]lthough a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence. [Citation.]" (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277 [113 S.Ct. 2078, 2080, 124 L.Ed.2d 182].) In *People v. Figueroa* (1986) 41 Cal.3d 714, 724 [224 Cal.Rptr. 719, 715 P.2d 680], the California Supreme Court held that in a criminal trial "[i]t has long been recognized that a trial judge 'may not direct a verdict of guilty no matter how conclusive the evidence.' [Citation.]"

■ Respondent acknowledges these authorities, which address the concept of directed verdict in the context of the guilt phase of the trial, not the NGI phase of a trial. Respondent also acknowledges the result in *People v. Hernandez, supra*, 22 Cal.4th 512, where the Supreme Court reversed a grant of directed verdict in favor of the prosecution in an NGI proceeding. But, respondent correctly points out that the outcome in *People v. Hernandez* related to procedural improprieties utilized by the trial court and that the Supreme Court specifically disavowed deciding whether "imposing a directed verdict to an insanity defense would violate the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 16, of the California Constitution." (*People v. Hernandez, supra*, 22 Cal.4th at p. 527.) Referring to the fact that the burden is on the defendant in connection with an NGI proceeding, respondent contends that an NGI proceeding is a special plea, similar to a plea of twice in jeopardy, which does not require submission to the jury when there are no facts to support the defense.

We first review how this issue was handled during the NGI phase in the trial court.

Dr. Sharma's testimony, as previously summarized, was taken out of order at the beginning of the NGI phase because of scheduling conflicts. After

Dr. Sharma's testimony was concluded, appellant presented his case-in-chief, which consisted of his testimony and that of his mother, as summarized previously. Mr. Lamb, the prosecutor, then addressed the court: "At this point, People would ask or be equivalent of 1118, would be a directed verdict. And the reason for that is there's absolutely no evidence that the jury could take to reach the decision that the defendant doesn't know right from wrong or didn't appreciate the nature and quality of his acts." Mr. Poland responded: "If the jury were to believe that [appellant] did not act consciously, that there was a second personality that took over during these periods he didn't remember anything, [appellant] would not know that he was doing wrong or that anything wrong was done and that this second personality certainly could not be shown to know right from wrong or that he appreciated the consequences of his acts based on the fact that he continued to press forward and commit these acts." The court denied the motion.

Mr. Lamb concluded his portion of the NGI phase by reading various stipulated facts into the record, reading the testimony from the victims given in the guilt phase of the trial, and calling to the stand the investigating detective, Christopher Derry. No rebuttal was presented. Mr. Lamb then renewed his motion. The following exchange took place:

"MR. LAMB: Your Honor, at this point, now that the court has heard all of the evidence, the People would again renew their motion for a directed verdict on the theory that the burden has to be preponderance of evidence, not just equal, and there is basically no evidence at all that the jury can conclude that [appellant] didn't know right from wrong or appreciated the nature and quality of his acts.

"[Appellant] himself testified back then he knew right from wrong and he knew and appreciated the quality of his acts. All he said on the stand was, I have no memory. The mother testified that the son clearly, back then, knew right from wrong and appreciate the nature and quality of his acts. At this point for the jury to reach the verdict contrary to legally be insane would be absolutely against the evidence that is present.

"THE COURT: Mr. Poland.

"MR. POLAND: Your Honor, the standard is whether or not there is any evidence that would support decision on appeal. It seems to me that if the jury were to believe [appellant] that he had no memory, was not responsible for what happened in periods of times when he had no memory, that supported by his mother's testimony that he did, in fact, know right from wrong as a conscious individual, that he may well be suffering from some

sort of delusion that has rendered him incapable of ascertaining right from wrong.

"THE COURT: All right. Thank you.

"*I'm going to grant the motion pursuant to Penal Code section 1118.1.* I believe that there has been no adequate scintilla of adequate competent evidence in which to find, if submitted to the jury, that [appellant] was criminally insane, that is, that he was not guilty by reason of insanity at the time the crimes for which he has been found guilty in 19 counts in the Information. It is clear to me that from the testimony that he gave, there is no reasonable basis in which a jury could conclude that he was insane within the meaning of the law.

"I intend to, therefore, enter a judgment that he did not sustain the burden of not guilty by reason of insanity, and the case will be remanded back to Judge Torribio for sentencing." (Italics added.)

The court returned the jury to the courtroom, explained that it had determined there was insufficient evidence as a matter of law upon which to present the matter to the jury, and dismissed the jury.

 ██ █ After review of the record, it is clear that the trial court did not intend to direct a verdict in favor of the prosecution.[4] Instead, the trial court relied upon section 1118.1 and effectively dismissed the plea. Procedurally, this case is similar to *People v. Hernandez, supra,* 22 Cal.4th 512.

In *People v. Hernandez,* the jury in the NGI phase of the trial deadlocked on a number of the counts regarding the defendant's sanity. The trial court concluded the jury was hopelessly deadlocked, declared a mistrial and dismissed the jury. More than 60 days later, the trial court concluded that no jury would be able to reach verdicts in the sanity phase of the remaining counts, dismissed the NGI plea pursuant to section 1385, entered a verdict of

---

[4]Authority for a trial court to grant a motion for a directed verdict is provided in Code of Civil Procedure section 630. The standard for granting a motion for directed verdict is explained as follows: " 'A directed verdict may be granted, when, disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in favor of the party against whom the verdict is directed, it can be said that there is no evidence of sufficient substantiality to support the verdict in favor of such party.' " (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 358-359 [124 Cal.Rptr. 193, 540 P.2d 33].) "The order of the court granting the motion for directed verdict is effective without any assent of the jury." (Code Civ. Proc., § 630, subd. (e).) "Thus, the matter is *never submitted* to the jury. The clerk simply enters whatever verdict is directed by the court." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2002) ¶ 12:379, p. 12-76.)

sanity on those counts, and sentenced defendant. The Court of Appeal affirmed the dismissal based on section 1385 and concluded that the "superior court 'essentially issued a directed verdict finding defendant sane as to [the remaining counts].'" (*People v. Hernandez, supra*, 22 Cal.4th at pp. 519-520.) The Supreme Court reversed and remanded the matter for a new trial on the sanity phase.

The Supreme Court first addressed whether a trial court has authority under section 1385 to dismiss the sanity portion of the action. "Penal Code section 1385, subdivision (a), provides that dismissal of an action, or part of an action, may be only on the judge's own motion or 'upon the application of the prosecuting attorney'; a defendant does not have the statutory privilege of moving to dismiss an action, or part of an action, under Penal Code section 1385, subdivision (a). [Citations.] [¶] Sanity proceedings do not constitute an *action*. Insanity is a plea raising an *affirmative defense* to a criminal charge. . . . Unlike an action, or part of an action, which can be dismissed only on the court's own motion or on application of the prosecution, a plea of insanity may be withdrawn by the defendant and the defendant alone. [Citation.] [¶] . . . [¶] The People urge that because the trial court can dismiss a part of an action under Penal Code section 1385, subdivision (a), and 'a sanity phase is undoubtedly a "part" of the criminal action against a defendant,' it follows that sanity proceedings can be dismissed 'without affecting the viability of the other parts of the overall criminal action.' The argument does not withstand scrutiny. [¶] It is true, as discussed, that we have affirmed a trial court's authority to dismiss a part of an action. [Citation.] Contrary to the People's suggestion, however, we have neither held nor implied that Penal Code section 1385, subdivision (a), authorizes the dismissal of a *plea* against a criminal charge or allegation. The cases cited by the People in support of their point are unavailing; they consistently refer to dismissal of charges or allegations in an indictment or information. . . . [¶] . . . [¶] The only action that may be dismissed under Penal Code section 1385, subdivision (a), is a criminal action or a part thereof. Such dismissal, by definition, runs only in the immediate favor of a defendant, i.e., by cutting off an action or part of an action *against* the defendant." (*People v. Hernandez, supra*, 22 Cal.4th at pp. 522-524, italics in original, underscoring added.)

The court then turned to the issue of directed verdict. "As a general matter, it is doubtful whether Code of Civil Procedure section 630, subdivision (f), is applicable at all in true criminal proceedings; it does not expressly refer to criminal actions and no provision in the Penal Code purports to allow for a directed verdict under that provision of Code of Civil Procedure section 630. Rather, it would seem that the Penal Code occupies

the field. [Citation.] [¶] In any event, there is no reference in the record to a motion for a directed verdict. *Nor did the superior court purport to order the entry of a directed verdict, as such, on the issue of insanity; it expressly ruled pursuant to Penal Code section 1385, subdivision (a), only.*" (*People v. Hernandez, supra,* 22 Cal.4th at p. 525, italics added & fn. omitted.) The Supreme Court concluded that if the court had relied upon Code of Civil Procedure section 630, subdivision (f), the ruling "would have been untimely and hence void." (*Hernandez,* at p. 525.)

Notwithstanding the procedural invalidity of the ruling based on Code of Civil Procedure section 630, the court addressed whether a motion similar to one for a directed verdict would have been appropriate under the circumstances presented. It concluded: "Even if the superior court had the express or inherent power to issue the equivalent of a directed verdict with regard to a plea of insanity, based on the lack of any substantial evidence, it could not do so here. For, viewing the evidence in the light most favorable to defendant, and drawing every legitimate inference in his favor, there *was* substantial evidence from which reasonable jurors could have concluded he was insane at the time he committed the remaining offenses. . . . Indeed, even the People concede that 'there was evidence in the instant case which could support a finding of insanity.'" (*People v. Hernandez, supra,* 22 Cal.4th at p. 527, italics in original.)

Justice Brown concurred in the result because she concluded there was sufficient evidence in the record to support the NGI plea. But she wrote separately on the issue of whether a trial court retains the inherent right to direct a verdict in favor of the prosecution if the defendant fails to carry the burden of proving the plea:

"Although we have never held that section 1385 of the Penal Code 'authorizes the dismissal of a plea against a criminal charge or allegation' . . . , we have long held that special pleas or defenses raising issues collateral to the issue of guilt or innocence do not require a jury finding. (See *People v. Newell* (1923) 192 Cal. 659, 668 [221 P. 622] (*Newell*).) Unlike the elements of a criminal offense, a defendant may waive these pleas and has the burden of proof. Therefore, '[i]t is just as necessary to support special pleas by proof [citation] as it is to interpose the pleas, and the failure to do either is to be deemed a waiver of the defense.' [Citation.]

"For over 75 years, we have applied these principles to the special pleas of once in jeopardy and former judgment of conviction or acquittal. [Citations.] Where 'the evidence is uncontradicted or leads to a single conclusion a question of law is presented' (*People v. Bechtel* (1953) 41 Cal.2d 441, 445

[260 P.2d 31] (*Bechtel*)), and 'the trial court is not required to submit the question to the jury for a finding upon that plea' [citations]. Instead, the court may strike the plea (see *People v. Mason* (1962) 200 Cal.App.2d 282, 285 [19 Cal.Rptr. 240]), or direct a verdict in favor of the prosecution or the defendant (see *Bechtel, supra,* 41 Cal.2d at pp. 445-446 [defendant]; *People v. Wilson* (1924) 193 Cal. 512, 515 [226 P. 5] [prosecution]).

"Like the pleas of once in jeopardy and former conviction or acquittal, the plea of not guilty by reason of insanity is a statutory defense that does not implicate guilt or innocence but, instead, determines 'whether the accused shall be *punished* for the *guilt* which has already been established.' [Citation.] The rules governing the insanity and double jeopardy pleas are virtually identical. The failure by a defendant to raise these defenses results in a waiver, and the defendant has the burden of proof when asserting them. [Citations.] . . .

"Because there is no logical basis for distinguishing between the pleas of insanity and double jeopardy, I would conclude that trial courts—which undoubtedly have the power to direct a verdict in the double jeopardy context—have the same power in an insanity proceeding under section 1026. If the court, upon viewing the evidence in the light most favorable to the defendant, determines there is insufficient evidence to support a finding of insanity as a matter of law, then it may remove the issue from the jury and direct a verdict of sanity. This approach is not only consistent with the case law, but also comports with logic. Given that the defendant—and not the prosecution—injects the issue of insanity into the proceeding and has the burden of proof, we may reasonably require him to introduce sufficient proof before submitting the issue to the jury.

"In doing so, we do not infringe on the defendant's constitutional rights. Under the United States and California Constitutions, a criminal defendant has the right to a jury determination of all elements of the charged offenses. [Citations.] Because a finding of insanity under California law 'is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense[,] it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established.' [Citations.] Thus, taking the issue of insanity away from the jury does not violate the United States or California Constitution. [Citations.]" (*People v. Hernandez, supra,* 22 Cal.4th at pp. 528-529 (conc. opn. of Brown, J.), fn. omitted.)

Here, as in *Hernandez,* the trial court did not reference Code of Civil Procedure section 630 or describe what it was doing as a directed verdict. It

relied solely on section 1118.1. That section provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of *a judgment of acquittal of one or more of the offenses* charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction *of such offense or offenses* on appeal. If such a *motion for judgment of acquittal* at the close of evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right." (Italics added.)

As with application of section 1385, discussed in *Hernandez*, it is clear from the statutory language that section 1118.1 contemplates a dismissal only in favor of the defendant, not the prosecution. Respondent does not argue otherwise. Thus, we conclude that the trial court erred in relying on section 1118.1 in dismissing the NGI plea.

But that does not end our review. While the trial court may have erred in selecting section 1118.1 as the basis for dismissing the claim, this begs the question of whether a trial court retains inherent authority to dismiss an NGI plea if the defendant fails to present evidence sufficient to support such a plea, the rationale used by the trial court here.

We agree with the majority in *Hernandez* that use of Code of Civil Procedure section 630 is problematical in the criminal context. But, as recognized by Justice Brown in her concurrence, there are other legal principles which establish that the trial court retains such inherent power in connection with special pleas requiring the defendant to carry the burden of proof.

As previously noted, in *Hernandez* the Supreme Court recognized a plea of not guilty by reason of insanity is a "special plea" with the burden of proof resting on the defendant. (*People v. Hernandez, supra*, 22 Cal.4th at p. 522.) The same is true with the plea of double jeopardy, or once in jeopardy.

In *Newell, supra*, 192 Cal. 659, the trial court directed a verdict in favor of the prosecution on defendant's plea of once in jeopardy when the defendant failed to present any evidence on the issue. The Supreme Court affirmed the trial court:

" 'When the guilt of defendant is in question, he is protected by the presumption of innocence; but when a former conviction or acquittal is in question he has no such presumption to aid him. Therefore, to sustain such a

plea, the burden is upon defendant, and he must prove not only the former conviction, acquittal, or jeopardy, but also the identity of the parties and of the offenses, and the jurisdiction of the court' [citation]. [¶] . . . [¶]

"It is just as necessary to support special pleas by proof [citation] as it is to interpose the pleas, and the failure to do either is to be deemed a waiver of the defense [citations]. It was said in *People* v. *Stoll,* 143 Cal. 689, 696 [77 P. 818]: 'The right to interpose a plea of once in jeopardy is a personal privilege, of which a defendant may, or may not, avail himself.' The principle was quoted in *People* v. *Bennett,* 114 Cal. 56, 59 [45 P. 1013], that 'The law's methods must be pursued by him who seeks the protection of the law.'

"The special pleas of appellant presented an issue of fact, and as no evidence was offered in support thereof, a question of law was presented to the trial court, which that court decided by instructing the jury to find for the prosecution on the special pleas. It was incumbent on the court to so instruct the jury (*People* v. *Cummings,* 123 Cal. 269, 272 [55 P. 898]; *People* v. *Wilkison,* 30 Cal. App. 473, 477)." (*Newell, supra,* 192 Cal. at pp. 667-668.)

*Newell* was followed by *People v. Wilson, supra,* 193 Cal. 512. In *Wilson,* the defendant struck and injured a woman with his vehicle. He was charged with and tried for a misdemeanor violation of the Motor Vehicle Act. Later, the woman died and new charges were filed against the defendant for manslaughter. He raised the special plea of once in jeopardy. The trial court concluded as a matter of law that the evidence offered by the defendant did not support defendant's claim of once in jeopardy, struck defendant's special plea, and ordered that the jury find against defendant on that plea. The Supreme Court affirmed: "[Appellant's] first contention upon this appeal is that the trial court was in error in striking out his offered evidence in support of his plea of 'once in jeopardy,' and in its direction to the jury to return a verdict against him upon his said plea. There is no merit to this contention. In order that a plea of once in jeopardy may be available to a defendant the second prosecution must be for the same offense, both in law and fact, as that for which the first prosecution was instituted. . . . In none of the cases cited by the appellant in support of his contention as to his plea of 'once in jeopardy' does the element of death, which is the essential basis of the charge of manslaughter, appear to be present; nor upon principle do we think a case can be conceived wherein a charge of murder or manslaughter could be defeated by a plea of once in jeopardy based upon a mere misdemeanor charge, trial, or conviction of the assault or offense which had later resulted in the death of the injured victim. It was therefore not error in the trial court

to strike out the defendant's offered evidence in that regard or to direct the jury to find against the defendant upon his aforesaid plea." (*People v. Wilson, supra*, 193 Cal. at p. 515.)

The same result obtained in *People v. Mason, supra*, 200 Cal.App.2d 282: "Such a plea, being affirmative in character, casts the burden of proof on the defendant, and hence ordinarily presents a question of fact which the jury alone has power to pass upon. But where a defendant fails to support his plea with proof, the question becomes one of law for the court. [Citations.] [¶] The record herein shows that at the time the prosecution moved to strike defendants' pleas of former jeopardy, the motion and defendants' opposition thereto were discussed in detail between court and counsel. At no time during the course of such discussion did either of defendants' counsel offer or suggest that they had any evidence to support their pleas. [¶] 'It is just as necessary to support special pleas by proof [citing cases] as it is to interpose the pleas, and the failure to do either is to be deemed a waiver of the defense . . . .' [Citing to *Newell.*] Or, as the court held in *People* v. *Vigghiany* [(1960)] 181 Cal.App.2d [621,] 631 [5 Cal.Rptr. 501]: 'Where the facts are uncontradicted and different inferences cannot be drawn, the decision on a plea of once in jeopardy . . . is one of law for the court to decide, not the jury.' " (*People v. Mason, supra*, 200 Cal.App.2d at p. 285; see also *People v. Ramirez* (1972) 27 Cal.App.3d 660, 670 [104 Cal.Rptr. 102].)

In *Leach v. Kolb* (7th Cir. 1990) 911 F.2d 1249 (*Leach*), the Seventh Circuit Court of Appeals entertained a petition for writ of habeas corpus on the issue of whether it was a violation of federal constitutional principles for the trial court to direct a verdict against a defendant in the sanity phase of defendant's criminal trial. *Leach* dealt with a conviction obtained in the state court of Wisconsin which has a bifurcated procedure similar to the procedure used in California to determine a plea of not guilty by reason of insanity. It also has a similar test of sanity. At the sanity phase of the trial, Leach called two expert witnesses, a psychiatrist and a psychologist. Neither could state with a reasonable degree of certainty that Leach was not sane when he committed the crimes. The prosecution called no witnesses, and the trial court directed a verdict in favor of the prosecutor. The Wisconsin Court of Appeals reversed on the issue of the directed verdict, but the Supreme Court of Wisconsin reversed the court of appeal. "The Supreme Court reasoned that trial courts are permitted to direct a verdict against a defendant on the issue of mental disease or defect 'if the judge finds there is no credible probative evidence toward meeting the burden of establishing the defense of not guilty by reason of mental disease or defect by a preponderance of the evidence after giving the evidence the most favorable interpretation in favor of the accused. . . .' [Citation.] The court went on to hold that, based on the

evidence Leach presented at trial, '[n]o reasonable juror could conclude . . . that the defendant suffered from any mental disease or defect, much less that he lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law as a result of mental disease or defect.' [Citation.]" (*Leach, supra,* 911 F.2d at p. 1254.)

The Seventh Circuit denied the petition for writ of habeas corpus, finding no constitutional infirmity:

"Leach's initial contention is that, given Wisconsin's statutory scheme for trying the issues of guilt and insanity in separate stages of the criminal trial when pleas of not guilty and not guilty by reason of mental disease or defect are entered, trial courts in Wisconsin may not direct a verdict on the question of insanity because to do so would violate the constitutional prohibition against directing verdicts in criminal cases. [Citation.] The petitioner is correct in his assertion that in criminal trials, ' "a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction." ' [Citations.] 'This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases.' [Citation.] Thus, a criminal defendant 'has an absolute right to a jury determination of *all essential elements* of the offense [charged in the indictment].' [Citations.]

"The Wisconsin Supreme Court, however, has made clear that insanity is an affirmative defense and that a finding of insanity is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense; it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established. [Citations.]

" '[T]he affirmative defense [of insanity] is of an entirely different nature from affirmative defenses utilized by defendants in the guilt phase, i.e., alibi, privileges, et cetera, which if proved result in an outright dismissal of the charge. Success on the affirmative defense of mental disease or defect does not have that result; rather, it is an affirmative defense to "responsibility"—it relieves the person of the *sanctions* for criminal conduct. It does not relieve the person already found guilty in the first phase of the factual finding of criminal conduct. Rather, the successful assertion of the affirmative defense in phase two results in a non-criminal sanction disposition. Thus, it is clear that phase two is not determinative of guilt in the sense of criminal conduct but only determinative of the disposition of the defendant in terms of the treatment to be afforded one who was insane at the time the guilty conduct

was performed.' [Citation.] We, of course, are bound by the Wisconsin Supreme Court's interpretation of Wisconsin law. [Citations.] Thus, because the insanity defense in Wisconsin is 'not concerned with the elements of criminal conduct,' [citation], we hold that the Wisconsin courts are not definitively prohibited by the sixth and fourteenth amendments from directing verdicts against criminal defendants on the issue of insanity. [Citation.] On the contrary, Wisconsin's rule permitting trial courts to direct a verdict on the insanity defense when there is insufficient evidence to create a jury question on this issue is in accord with the practice of a number of other state and federal courts, including this court, of withdrawing the issue of insanity from the jury under similar circumstances. [Citations.] Although these [cited] cases speak in terms of a trial court's refusal to instruct the jury on the issue of insanity, this court has recognized that a refusal to instruct and a directed verdict have the same result: removing the issue from the jury's consideration. [Citation.]" (*Leach, supra,* 911 F.2d at pp. 1255-1256, fns. omitted.)

We conclude there is no constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea. As recognized by Justice Brown in *Hernandez,* and the prior cases involving double jeopardy, courts retain an inherent power to remove an affirmative defense from the jury where there is no evidence to support it.

■ We turn now to whether sufficient evidence was presented to the jury in this case.

As noted at the beginning of this section, it was appellant's burden to prove by a preponderance of the evidence that he suffered from a "mental condition which render[ed him] incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act." (*People v. Kelly, supra,* 10 Cal.3d at p. 574.) In other words, there is a causation element connecting appellant's criminal acts and a *mental condition.* Establishing such a causal connection requires evidence that appellant is suffering from a specific mental condition. There is no such evidence in the record.

The only expert who testified was Dr. Sharma. He concluded that at all times appellant appreciated the nature and quality of his actions and was able to distinguish between right and wrong. While he agreed that appellant had some mental problems, he identified no mental condition which may have attributed in any way to appellant's criminal actions.

Appellant testified that within six months prior to his criminal actions he had been blacking out and that he only remembered two of the four victims. He also presented evidence of his use of illegal drugs, suggesting that this may have contributed to his temporary blackouts. In opposing the motion to dismiss the special plea, counsel for appellant suggested that a jury may believe that appellant's actions were done when he was not sufficiently conscious to be able to understand the nature and character of his actions or distinguish between right and wrong. But "[t]he defense of insanity is one thing, and the defense of unconsciousness is another. [Citation.]" (*People v. Martin* (1948) 87 Cal.App.2d 581, 588 [197 P.2d 379].)

The defense of unconsciousness applies to the guilt phase of the trial and is provided for in section 26: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Four—Persons who committed the act charged without being conscious thereof."

The difference between temporary unconsciousness and the defense of insanity was addressed in *People v. Kelly, supra,* 10 Cal.3d at pages 575-576:

"Policy considerations support [the] distinction in treatment between voluntary intoxication resulting in unconsciousness and voluntary intoxication which cause insanity. The former encompasses those situations in which mental impairment does not extend beyond the period of intoxication. In such cases, our analysis in *People* v. *Hood* [(1969)] 1 Cal.3d [444,] 458 [82 Cal.Rptr. 618, 462 P.2d 370], while phrased in terms of alcoholic intoxication, is entirely applicable: 'A compelling consideration is the effect of alcohol on human behavior. A significant effect of alcohol is to distort judgment and relax the controls on aggressive and anti-social impulses. [Citations.] Alcohol apparently has less effect on the ability to engage in simple goal-directed behavior, although it may impair the efficiency of that behavior. In other words, a drunk man is capable of forming an intent to do something simple, such as strike another, unless he is so drunk that he has reached the stage of unconsciousness. What he is not as capable as a sober man of doing is exercising judgment about the social consequences of his acts or controlling his impulses toward anti-social acts. He is more likely to act rashly and impulsively and to be susceptible to passion and anger. It would therefore be anomalous to allow evidence of intoxication to relieve a man of responsibility for the crimes of assault with a deadly weapon or simple assault, which are so frequently committed in just such a manner.'

"When long-continued intoxication results in insanity, however, the mental disorder remains even after the effects of the drug or alcohol have worn off. The actor is 'legally insane,' and the traditional justifications for criminal punishment are inapplicable because of his inability to conform, intoxicated or not, to accepted social behavior. . . . The proper rule of law was

early established in *People* v. *Travers* [(1891)] 88 Cal. [233,] 239-240 [26 P. 88]: '[S]ettled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause. *But it must be "settled insanity," and not merely a temporary mental condition produced by recent use of intoxicating liquor.*' . . . Thus, it is immaterial that voluntary intoxication may have caused the insanity, as long as the insanity was of a settled nature and qualifies under the M'Naughton test as a defense." (Italics in original.)

In 1993, the Legislature added section 25.5 to the Penal Code. As pertinent, that section provides: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances."

The evidence relied upon by appellant to suggest that he qualified within the M'Naughton test was that he took illegal drugs which may have caused his temporary blackouts. While there is no evidence establishing that appellant's use of illegal drugs may have caused his blackouts, even if there had been such evidence, under section 25.5 it would be insufficient to establish the defense. Also, the evidence is consistent with only a temporary mental condition, not the "settled insanity" as enunciated in *People v. Kelly, supra,* 10 Cal.3d at page 576.

We conclude it was not error for the trial court to take the issue of insanity from the jury.

### DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 14, 2003. Kennard, J., was of the opinion that the petition should be granted.