Filed 11/9/15  P. v. Galvez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B254807 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA097565) |
| v. | |
| JAIME AYALA GALVEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Mike Camacho, Jr., Judge.  Affirmed and remanded with instructions.

California Appellate Project, David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Jaime Galvez (defendant) on multiple counts based on a high speed pursuit by police during which defendant discharged a shotgun at officers. On appeal defendant contends that the trial court erred by: (i) denying his *Faretta*[1] motions; (ii) forcing him to testify in the middle of the prosecution's case; (iii) failing to instruct or failing to instruct adequately on voluntary intoxication; (iv) committing reversible cumulative error; and (v) directing a verdict of sanity during the sanity phase of the trial. Defendant further contends that his trial counsel rendered ineffective assistance by failing to object to inadmissible hearsay from an expert, failing to request jury instructions on voluntary intoxication and mental impairment, and committing reversible cumulative error. In a supplemental brief, defendant contends that the five-year sentence enhancement imposed by the trial court pursuant to Penal Code section 667, subdivision (a)[2] was unauthorized and must be stricken.

We hold that defendant waived or abandoned his challenge to the rulings on his *Faretta* motions; any error in forcing defendant to testify in the prosecution's case was harmless; defendant has failed to show ineffective assistance of counsel as to the hearsay issue; the trial court did not err in instructing the jury on voluntary intoxication as to count 1, and any ineffective assistance of counsel in failing to request adequate instructions on voluntary intoxication and mental impairment was harmless; there was no cumulative error because the errors about which defendant complains either did not occur or were harmless; and the trial court had the discretion to direct a verdict of sanity, and substantial evidence supported the directed verdict. We further hold that the trial court imposed an unauthorized five-year sentence enhancement under section 667, subdivision (a) that must be stricken on remand.

---

[1]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

## A.     Prosecution's Case

### 1.     Officer Mullane's Testimony

On April 10, 2012, at about 10:00 p.m., California Highway Patrol Officer David Mullane was back at his office refueling his patrol vehicle. While monitoring his radio, he heard a report of a driver on the westbound 10 freeway brandishing a weapon. He then heard that California Highway Patrol Officer Aaron Rolens had located the suspect vehicle—a silver Dodge Caliber—and that it was exiting the freeway at Puente Avenue. Officer Mullane proceeded to that location and observed the Dodge, two patrol vehicles, and a motorcycle officer exit the freeway at Puente onto North Garvey Avenue where they entered a Home Depot parking lot. The first patrol vehicle had its forward-facing red light activated.

Officer Mullane entered the Home Depot parking lot and positioned his vehicle to prevent the Dodge from exiting the lot from the driveway it had used to enter. He also activated his vehicle's forward-facing red lights. The vehicle went through the parking lot past the Home Depot with Officer Rolens in pursuit. Officer Mullane followed behind Officer Rolens's vehicle. The vehicle made a left turn from the parking lot against a red light and went south on Puente. It then made another left turn against a red arrow onto North Garvey Avenue from where it reentered the westbound 10 freeway. Officer Rolens was in pursuit with his siren activated and Office Mullane followed in secondary pursuit.

As soon as the Dodge entered the westbound 10 freeway, it accelerated to speeds in excess of 100 miles per hour. Officer Mullane was "pacing" the vehicle, "[m]aking [his] patrol vehicle go the same speed as [the Dodge] so [he] neither gain[ed] nor los[t] distance on the [Dodge]."

As it travelled down the 10 freeway, "the Dodge made several lane changes in order to get around slower vehicles. At times it used the center median area in order to

3

pass vehicles." Traffic was moderate, but "several vehicles had to either swerve to the right or to the left in order to avoid collisions or brake abruptly in order to avoid striking [the Dodge] or having [the Dodge] strike them." During the course of the pursuit on the westbound 10 freeway at San Gabriel Boulevard, Officer Mullane heard "a distinct noise" from the Dodge that sounded like a report from a shotgun.

The Dodge transitioned to the northbound 101 freeway where traffic was heavier. The farther north on the 101 the vehicles travelled, the heavier the traffic became, causing the Dodge and the pursuit vehicles to slow down to speeds of 80 miles per hour or less.

The Dodge was using the center median and the number one lane to pass slower vehicles. As it attempted to pass a Jaguar in the number one lane, it collided with the left rear of a Jaguar "with such force that it broke [the Jaguar's] left rear axle and broke the wheel."

Officer Mullane stopped, exited his vehicle, and approached the Dodge from the right side. Officer Rolens simultaneously made an approach on the left side. When he arrived at the vehicle, Officer Mullane observed defendant in the driver's seat and concluded that he had been stunned by the collision and was nonresponsive. Defendant, who was the only occupant of his vehicle, did not respond to Officer Mullane's several loud and distinct commands to show his hands.

Office Mullane saw a shotgun in the vertical position on the front passenger seat of the Dodge. Because the right front passenger window was open, Officer Mullane was able to reach into defendant's vehicle, retrieve the shotgun, and retreat to a position of cover at a patrol vehicle. As Officer Rolens also retreated to cover, "he made sure that the driver of the Jaguar was taken out of that vehicle . . . to a position of safety."

In both English and Spanish over a patrol vehicle's public address system, defendant was given clear commands to surrender by exiting the Dodge with his hands up. Instead of complying with the commands, defendant began searching around the interior of his vehicle as if looking for the shotgun. Defendant not only stated that he would not exit his vehicle, but also made several hand gestures with his middle fingers.

4

Defendant eventually exited the Dodge with a can of beer in his hand, refused to comply with any commands, and gestured to the officers to "come and get [him]." Two officers who had taken up a position on the southside of the freeway were armed with a "less lethal shotgun" that fired a bean bag round. One of those officers fired a bean bag round that struck defendant and knocked him to the ground. Defendant immediately stood up, a reaction that suggested to Officer Mullane the defendant was high on alcohol or drugs. Defendant was shot a second time with a bean bag, and stood up again after falling to the ground. After defendant was shot with two more bean bag rounds, he eventually became incapacitated enough for officers to approach and handcuff him.

Officer Mullane found three spent shotgun casings in the Dodge. There was also a box of live shotgun rounds that spilled its contents into the interior of the vehicle. The shotgun itself contained three live rounds.

### 2.        *Officer Rolens's Testimony*

On April 10, 2012, Officer Rolens was working as a road patrol officer assigned to the Baldwin Park area. At approximately 9:48 p.m., he received a monitored call from dispatch advising that someone in a vehicle was brandishing a firearm at another vehicle. The witness provided a license plate number and a vehicle description, i.e., a silver Dodge Caliber.

While driving westbound on the 10 freeway, east of Puente Avenue, Officer Rolens located the silver Dodge suspect vehicle, which was weaving in a "serpentine manner" in the number two lane. The Dodge then changed lanes to the number one lane and in the process, the left side tires of the vehicle crossed the solid yellow line that delineated the south roadway edge of the freeway so that the vehicle was partially driving in the center medium. Officer Rolens concluded that the vehicle was being operated by a driver who was under the influence of alcohol or drugs.

Near Puente Avenue, the Dodge made an abrupt turning movement from the number two lane across the number three and four lanes. When the vehicle exited the freeway at Puente, Officer Rolens attempted to initiate an enforcement stop by activating

his patrol vehicle's overhead emergency lights. The vehicle made a left turn into the parking lot of a shopping complex and proceeded to drive through the lot without stopping.

After the Dodge exited the parking lot, it made a left turn onto southbound Puente and then another left turn onto eastbound North Garvey Avenue, both times failing to stop for red traffic signals. The vehicle then reentered the westbound 10 freeway. While the vehicle was westbound on the 10 freeway near San Gabriel Boulevard, Officer Rolens heard a gunshot. When the vehicle moved to the right, Officer Rolens observed a shotgun outside the driver's side window. The shotgun was pointing "up and back toward [Officer Rolens]." The vehicle continued westbound until it reached the "carpool bus flyover" near the 710 freeway. Eventually, the vehicle entered the northbound 101 freeway near downtown Los Angeles.

The Dodge continued northbound on the 101 freeway where traffic became heavy. It was continuously travelling in excess of 65 miles per hour and, at times, in excess of 100 miles per hour. The vehicle "was weaving across multiple lanes of traffic. The driver . . . crossed over double yellow lines into the carpool lane on multiple occasions and back out the carpool lane over those double yellow lines, and several times made unsafe lane changes, causing other drivers to take evasive action to avoid a collision."

The pursuit terminated on the northbound 101 freeway when the Dodge collided with a Jaguar.[3] Officer Rolens, who had been joined by Officer Mullane, saw that there was no movement inside the Dodge. They decided to approach the vehicle and remove the shotgun. Officer Mullane was able to remove the shotgun from the vehicle.

Officer Rolens next observed defendant looking around the interior of the Dodge on the passenger side, as if he was searching for the shotgun Officer Mullane had removed. The officer then saw defendant exit the passenger side of his vehicle making a gesture with both his middle fingers. Defendant had a can of beer in his left hand.

---

[3]     The collision caused the left rear axle of the Jaguar to break and the left rear wheel to separate from the Jaguar.

Defendant was given multiple instructions to "get on the ground," but he refused to comply. At that point, another officer discharged a "less lethal shotgun," hitting defendant in the abdomen with a bean bag round and causing him to fall to the ground. Defendant stood up immediately and picked up his beer. Defendant was shot three more times with beanbag rounds, and the officers were eventually able to take him into custody.

Defendant was brought to the rear of a patrol vehicle and Officer Rolens stood next to him. Defendant smelled of alcohol and "what little he was saying was slurred."

## B.    Defendant's Case

After not sleeping for four days, defendant went to bed at about 8:00 a.m. on April 10, 2012. He woke up at 1:00 or 2:00 p.m. that day. He woke up with a "big hangover" and began drinking. Because he was "shaky," he took prescription Xanax. He also took his wife's prescription Vicodin.[4]

Defendant and his wife owned two houses and he had gone to bed that day at the smaller of the two houses. Upon awakening, he decided to drive to the larger house to use the restroom. On his way, he stopped to buy beer and rent movies. After using the restroom at the larger house, defendant went downstairs to his wife's room, saw his wife's shotgun and a box of shotgun shells, and decided to take them to his wife at the smaller house. As he walked from the larger house back to his car, he decided to fire the shotgun. He loaded the shotgun and fired it three times.

Defendant returned to the smaller house to pick up his laptop computer. He spoke to his wife and told her he was going to buy some food to eat while he watched the movies he had rented.

Defendant entered his vehicle and drove, but he could not remember to where he drove. The first thing he remembered about the drive was passing a freeway sign for

---

[4]    During cross-examination, defendant admitted to using alcohol, cocaine, methamphetamine, Xanax, and Vicodin on April 10, 2012.

7

Rialto. The next thing he remembered was going through Baldwin Park. He did not remember exiting the freeway or driving on surface streets.

When he first entered Baldwin Park, he saw "Satan" behind him. He was afraid and wanted to "get away." The next think he remembered, he saw a "white big wall" and became unconscious. He thought "it was the impact that deployed it." .

When he regained consciousness, he heard helicopters and a voice in his head. He was confused and afraid. He looked up and saw soldiers pointing guns at him and the voices in his head told him to "die with honor and [to] give [his] life for [his] country." The scene prompted memories of when he "used to jump out of the airplane and helicopters [in the military] . . . ."

Because a voice in his head was telling him to die, defendant told the soldiers to kill him. Defendant was hit with something in his abdomen that caused a "very warm feeling all the way [through his] body . . . ." He felt all his strength leave him and "saw [himself] going down in the shadow." He fell to the ground and lost consciousness. The next thing he remembered, he was lying on a stretcher in an ambulance. Defendant went in and out of consciousness. Defendant did not recall holding a firearm while driving his vehicle.

Forensic psychologist Haig Kojian, who testified for the defense, prepared for his testimony by reviewing police reports, a probation officer's report, a preliminary hearing transcript, and medical records relating to defendant. The majority of the medical records indicated that defendant had been diagnosed as suffering from depression and anxiety. The records also reflected that defendant was addicted to various illegal substances and alcohol. According to Kojian, it was possible that a person who was under the influence of drugs and was experiencing emotional problems could be compromised to such an extent that he or she might experience difficulty formulating specific intent. Kojian explained that if depression became severe enough, a patient could become psychotic. He did not, however, see anything in defendants' medical records indicating that defendant was psychotic or delusional.

8

### C. Defendant's Testimony During Sanity Phase

Following the jury's verdict, defendant testified in the sanity phase as follows. Defendant served in the military from 1979 to 1984. During that time, he suffered 10 to 15 head injuries caused by "jumping from airplanes." After he left the military, defendant had surgery to treat one of his head injuries.

Defendant reenlisted in the military, but developed a drinking problem. His last year in the military, he developed depression and his speech impediment worsened. He was demoted several times for alcohol-related reasons and was eventually discharged "with honorable conditions," but with an indication that he had failed to rehabilitate from alcohol addiction.

After he left the military the second time, defendant had suicidal thoughts. He was treated at a Veteran's Administration Hospital for alcohol addiction by a psychiatrist. His alcohol abuse became progressively worse from 1984 to 2002 when he went to prison. Thereafter, he was able to remain sober for the next nine years.

From 2004 to 2012, defendant received disability benefits from the Social Security Administration. Among other medications, defendant was taking prescription Xanax with Celexa, an anti-psychotic medication in April 2012. The Xanax with Celexa caused defendant to have suicidal thoughts.

About a year before April 2012, defendant had a series of anxiety attacks that resulted in several emergency room admissions. After being sober for nine years, defendant's daughter made him mad one day, causing him to begin drinking again.

On April 10, 2012, while defendant was driving on the freeway, he was hallucinating.

# PROCEDURAL BACKGROUND

In an amended information,[5] the Los Angeles County District Attorney charged defendant in count 1 with evading a police officer in violation of Vehicle Code section 2800.2, subdivision (a); in count 2 with assault with a firearm on a peace officer in violation of section 245, subdivision (d)(1); in count 3 with shooting at an occupied motor vehicle in violation of section 246; in count 4 with discharging a firearm from a motor vehicle in violation of section 26100, subdivision (d); in count 5 with felon in possession of a firearm in violation of section 29800, subdivision (a)(1); in count 6 with felon carrying a loaded firearm in public in violation of section 25850, subdivisions (a) and (c)(1); in count 7 with discharging firearm in a grossly negligent manner in violation of section 246.3, subdivision (a); in count 9 with resisting, delaying, or obstructing a police officer in violation of section 148, subdivision (a)(1); in count 10 with driving under the influence of alcohol in violation of Vehicle Code section 23152, subdivision (a); and in count 11 with driving with a blood alcohol concentration of 0.08 or greater in violation of Vehicle Code section 23152, subdivision (b).

The District Attorney alleged as to counts 1 through 7 that defendant had suffered a prior conviction for a serious or violent felony within the meaning of sections 667, subdivisions (b) through (i) and 1170.12, subdivisions (a) through (d).  The District Attorney further alleged as to count 2 that defendant  personally used and personally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c).  And the District Attorney alleged as to counts 10 and 11 that defendant had suffered a prior conviction within the meaning of Vehicle Code sections 23540 and 23546.

Following a jury trial, the prosecution dismissed count 11 pursuant to section 1118.1.  The jury found defendant guilty on all charges and found the allegations true.  Defendant admitted the alleged prior strike conviction.

---

[5]     The multiple count information did not contain a count 8.  By stipulation, the trial court renumbered count 9 as count 8, count 10 as count 9, and count 11 as count 10  for purpose of trial and the verdict form only.

Defendant testified during the sanity phase of the trial. Following his testimony, the trial court directed a verdict of sanity.

At the sentencing hearing, the trial court sentenced defendant to an aggregate sentence of 38 years and four months comprised of the following: a middle term six-year sentence on count 2, doubled to 12 years based on the prior strike conviction, plus an additional 20-year sentence pursuant to section 12022.53, subdivision (c) and a five-year sentence enhancement pursuant to section 667, subdivision (a); and a consecutive one-third the middle term sentence of one-year, four months on count 1. The trial court imposed but stayed concurrent sentences on counts 3 through 7. The trial court imposed a concurrent one-year term on count 9 and a six-month term on count 10.

## DISCUSSION

### A.      Denial of *Faretta* Motion

#### *1.      Background*

On August 6, 2013, defendant appeared for trial represented by appointed counsel. When the trial court, Judge Hunt presiding, called the matter, counsel for the parties, defendant, and the court engaged in the following discussion: "The Court: Jaime Galvez. [¶] [Prosecutor]: Good morning, your Honor. [. . .] People are ready, but I'm engaged in Department E. [¶] [Defense Counsel]: That's my matter. [¶] The Court: Matter over for Monday, August 12. [¶] [Defense Counsel]: The last we were here, my client wanted to go pro per. [¶] The Court: Let's bring him out after lunch. . . . People v. Galvez, Case No. []. Defendant's present in custody with counsel, [defense counsel]. People represented by [the prosecutor]. This matter is here for jury trial. [¶] [Prosecutor]: Your Honor, I'm currently engaged. I'm asking to continue it to Monday, the 12th. [¶] [Defense Counsel]: Your Honor, as of last week, my client's adamantly been voicing his opinion that . . . is kind of quasi-Marsden and a pro per request that he was not satisfied with my services, and he'd like to represent himself. [¶] [Defendant]:

11

Yes, your Honor. May I please? [¶] The Court: Can you be ready to go to trial Monday? [¶] [Defendant]: No. [¶] The Court: Denied. Jury trial Monday, August 12. [¶] [Defendant]: Your Honor, can I please—can you please reconsider my request to represent myself because [defense counsel] is not doing that I—I been asking for her. [S]he wanted me to take 24 years on the 22nd of May. I was coerced and threatened by the—by the D.A. in a room. That's why—when I came here on May the 22nd, I was here. I spoke to you then I left the building because I had an anxiety attack because I was threatened and coerced to take 14 years. That's why I would like to represent myself. At this time, I would like to exercise my *Faretta* rights, your Honor. [¶] The Court: Denied. You can't be ready to go to trial. This matter here is for trial. Today I don't have a trial court. So it is over to Monday. That's denied. And [defense counsel] calls the shots, not you, on the way the case is handled. You don't get to call them; she does. [¶] [Defendant]: May I ask you one more time, your Honor? Can I give you this letter that-- [¶] The Court: No. [¶] [Defendant]: -- I -- [¶] The Court: Give it to your lawyer. [¶] [Defendant]: -- wrote to you? [¶] The Court: Don't give it to the Court. Give it to your lawyer. That is an ex-parte communication. I cannot accept it. Give it to your lawyer. Don't give it to the Court."

On August 12, 2013, the parties again appeared for trial before Judge Sortino. When defendant renewed his request that he be allowed to represent himself, the following proceedings took place. "The Court: Jaime Galvez. [The prosecutor] for the People; [Defense Counsel] for the defense. People ready? [Prosecutor]: Yes. [¶] The Court: Defense ready? [Defense Counsel]: I am but my client wants to go pro per and wants to enter an EGI. [¶] The Court: He wants—so he wants to fire the public defender's office and represent himself? [¶] [Defense Counsel]: Yes. [¶] The Court: All right. Let's bring him out, then. People v. Galvez, Case No. []. He's present in Court in custody with [defense counsel]; Prosecutor for the People. You're ready? [¶] [Prosecutor]: Yes. [¶] The Court: And [defense counsel], you're ready but your client wants to address the Court? [¶] [Defense Counsel]: Yes. [¶] The Court: [Defendant], what is it you want to tell me? [¶] The Defendant: Yes. Good morning. I'm sorry

12

because I stutter sometimes. I apologize for that. [¶] The Court: It's all right. No need to apologize. [¶] The Defendant: *I have asked for the plea of not guilty by reason of insanity back on June 19 and* [*defense counsel*] *failed to enter that plea.* [¶] The Court: That's between you and her regarding what plea you would enter and what defenses may be available to you. Is there anything else that you would like to talk to me about? [¶] The Defendant: I would like to exercise my right—*Faretta* rights against California to represent myself because the public defender that I have has not submitted some of the evidence. We're not getting along very good. [¶] The Court: You want to represent yourself and no longer have the public defender be your lawyer? [¶] The Defendant: Yes, sir. Your Honor, if I may ask the Court to help me to get the proper -- [¶] The Court: Let me ask you this: If I were to grant your right to represent yourself and relieve the public defender and allow you to represent yourself, would you be ready to go to trial today? Today is the day for your trial. Would you be ready to go to trial today? [¶] The Defendant: Today? [¶] The Court: Yes. Today is set for your trial. You are 54 of 60. Your trial has been set. It looks like since June 19 is when the trial was set. Today is the day set for trial. If you relieve [defense counsel] and I allow you to represent yourself, would you be ready to start your trial today? [¶] The Defendant: I've been incarcerated 14 months. I have not got a police report. I have requested a police report from the public defender. I have been denied of that also, your Honor. [¶] The Court: My question for you—listen to me. If I were to relieve the public defender today and allow you to represent yourself, would you be ready to start trial today? [¶] The Defendant: No, your Honor. [¶] The Court: Okay. [¶] The Defendant: I need a little bit of time. [¶] The Court: You would be unable to start trial today? [¶] The Defendant: No. [¶] The Court: Would you be able to start trial today? [¶] The Defendant: I cannot start trial today. [¶] The Court: Thank you. [Defense counsel], you're ready. [¶] [Defense Counsel]: Yes. [¶] The Court: The request to represent himself pursuant to *Faretta* is denied. It's untimely. Today is the day for trial set back in June. He has indicated he's unable to start trial today. The request to represent himself will be denied as it is untimely."

After denying defendant's renewed request to represent himself, the trial court asked defendant's counsel if she thought there was a *Marsden*[6] issue separate and apart from the *Faretta* issue. When defendant's counsel answered in the affirmative, the trial court held an in camera *Marsden* hearing. Following the in camera proceeding, the trial court denied the *Marsden* motion and then the following exchange took place: "The Court: Let me ask you one other question, [defendant], with respect to your request to represent yourself, you're not ready today; is that correct? [¶] The Defendant: That's correct. [¶] The Court: How much time would you need to get ready? [¶] The Defendant: How much time: [¶] The Court: Yes. [¶] The Defendant: 40 days. [¶] The Court: 40 days? So roughly a month and a half? [¶] The Defendant: Yes. [¶] The Court: [Prosecutor], are the People ready? [¶] [Prosecutor]: Yes. [¶] The Court: You have witnesses under subpoena? [¶] [Prosecutor]: I do. [¶] The Court: To continue this trial at this point, would that cause an inconvenience to these witnesses as well as cause delays to the People and deprive them of speedy trial? [¶] [Prosecutor]: Yes. [¶] The Court: The request for *Faretta* is denied based upon the fact it's untimely. He's not ready to go today. He needs another month and a half. The People are ready. *Faretta* is denied. Ready? [¶] [Prosecutor]: Yes. [¶] Are you ready? [¶] [Defense Counsel]: Yes. [¶] The Court: Case is transferred forthwith to Department R. Department R for jury trial. The issue needs to be heard with Judge Falls as soon as you get to his Court. [¶] [Defense Counsel]: Yes."

That same day, the parties appeared in the assigned trial department before Judge Falls. In response to defendant's attorney's request to discuss "some matters involving case strategy," the trial court held an in camera hearing.

The following day, August 13, 2013, the parties again appeared in the department assigned for trial before Judge Falls. The trial court and defendant's attorney engaged in the following discussion about defendant's desire to enter a plea of not guilty by reason of insanity. "The Court: The Court has been vexed over the issue of the defendant's

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

14

desire to enter a not-guilty-by-reason-of-insanity plea.  In reading over the code and the various cases that are involved, there does not appear to be a bright line.  [¶]  Initially, the Court thought, believed did not have discretion, that it must allow the plea.  However, at this point in time, my tentative is as follows:  [¶]  Court believes it has discretion whether or not to allow the plea to be entered at this stage of the proceeding, and that it's my obligation to exercise that discretion.  Court believes that, had the defendant entered his plea or entered his plea when he was first charged with the crime either at the arraignment on the complaint or at the arraignment on the information, that he would have been allowed to do so.  There would not have [been] discretion.  [¶]  It's not counsel's decision to make.  Counsel's job [is] to advise.  Counsel's job [is] to tell him, as it is every defendant, whether it's a wise decision or poor one.  But at the original arraignment, if that was the defendant's desire, he would have been allowed to enter the plea.  [¶]  The question is for the Court, should I allow that plea to occur now a year and a half later after he was originally arrested and charged with these offenses?  [¶]  We've looked up various cases, discussed cases.  I've given counsel opportunity to talk to their various appellate departments and do research, so I am going to allow counsel to argue at this point in time.  [¶]  [Defense Counsel], you—things that we can agree on.  You agree if your client wishes to enter a plea—let's not worry about the Court's discretion, even though you believe it to be an unwise decision and tactically a mistake—you agree that he can do so?  [¶]  [Defense Counsel]:  Yes.  [¶]  The Court:  And you are not standing in his way from doing so?  [¶]  [Defense Counsel]:  No.  [¶]  The Court:  Okay.  As his advocate on this issue, what is your position with regards to the Court's discretion on this matter?  [¶]  [Defense Counsel]:  After reviewing many of the cases that were discussed yesterday--  [¶]  The Court:  Correct.  [¶]  [Defense Counsel]:  I agree that at this time period that the Court has discretion in deciding not necessarily whether there's the mental state or mental history to support making such a plea, but the discretion in deciding whether there's good cause within Penal Code section 1015 to show a plausible reason for delay in tendering the plea."

After further discussion with counsel, the court conducted another in camera proceeding on the issue. Following that in camera proceeding and after further discussions on the record, the trial court again conducted an in camera proceeding on the issue. Following the conclusion of that proceeding, the trial court stated: "The Court: Back on the record on the matter of People v. Galvez, Case No. []. Record should reflect the Court was prepared to deny the motion. [¶] Based on information the Court received during the in-camera hearing, [the Court] believes its obligated to allow the defendant to enter his plea. I don't believe it's well taken or timely, but I want to avoid problems on appeal. [¶] . . . [¶] The Court: All right. [Defendant], you have insisted on entering a plea of not guilty by reason of insanity against your attorney's advice. Is that correct, sir? [¶] The Defendant: Yes, your Honor. [¶] The Court: How do you plead to the charges? [¶] The Defendant: Not guilty by reason of insanity. [¶] The Court: All right. Court will show the defendant has entered not-guilty-by-reason-of-insanity defense. You understand this case is going to have to be continued at least 90 days at this point in time? [¶] The Defendant: Yes, your Honor. [¶] The Court: Court orders two doctors from the Panel to be appointed. They are to interview the defendant."

Following further discussion with defendant and counsel, defendant informed the trial court that he "want[ed] to withdraw that,-- I'm very satisfied with [appointed counsel] as my defense counsel." The minute order of the August 13, 2013, proceedings stated, "Defendant withdraws his previous request to proceed pro per and states that he was satisfied with his current counsel."

### 2. *Faretta and Waiver*

The principles governing a criminal defendant's right to self representation, the so-called *Faretta* right, are well settled. "*Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request. (*People v. Marshall* [(1997)] 15 Cal.4th [1,] 20-21.) The right to self-representation obtains in capital cases as in other criminal cases (*People v. Clark* (1990) 50 Cal.3d 583, 617 [268 Cal.Rptr. 399, 789 P.2d 127]), and may be asserted

16

by any defendant competent to stand trial—one's technical legal knowledge, as such, being irrelevant to the question whether he knowingly and voluntarily exercises the right (*Godinez v. Moran* (1993) 509 U.S. 389, 399-400 [125 L.Ed.2d 321, 113 S.Ct. 2680]; *People v. Joseph* (1983) 34 Cal.3d 936, 943-944 [196 Cal. Rptr. 339, 671 P.2d 843]). The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 20.)" (*People v. Dunkle* (2005) 36 Cal.4th 861, 908-909.)

"[T]he *Faretta* right, once asserted, may be waived or abandoned. In *McKaskle v. Wiggins* (1984) 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944], in which the trial court appointed standby counsel for a self-represented defendant, the United States Supreme Court concluded that the defendant, who had acquiesced in standby counsel's participation at various points during the trial, could not complain on appeal that he was denied his right to represent himself at those points. (*Id.* at pp. 182-183.) In *Brown v. Wainwright* (5th Cir. 1982) 665 F.2d 607, the federal court of appeals concluded that a defendant who, expressing dissatisfaction with his attorney, first asserted his right of self-representation and later made no objection when his counsel told the court that he and the defendant had resolved their difficulties and that the defendant wanted him to continue his representation, had waived his *Faretta* request. (*Id.* at p. 611; see also *People v. Rudd* (1998) 63 Cal.App.4th 620, 628-631 [73 Cal.Rptr.2d 807]; *id*. at p. 631 [a defendant who failed to object to revocation of his self-represented status for '"serious and obstructionist misconduct"' in failing to be ready for trial on the date he had agreed could not complain on appeal]; *People v. Skaggs* (1996) 44 Cal.App.4th 1, 7-9 [51 Cal.Rptr.2d 376] [even if the defendant's equivocal comment were construed as a *Faretta* request, he abandoned it by failing to seek a definitive ruling on it]; *People v. Kenner* (1990) 223 Cal.App.3d 56, 62 [272 Cal.Rptr. 551] [a defendant may, by his or her conduct, indicate abandonment or withdrawal of a request for self-representation].)" (*People v. Dunkle, supra*, 36 Cal.4th at p. 909.)

"A defendant's waiver or abandonment of this constitutional right [to self representation] should be voluntary, knowing, and intelligent (*People v. D'Arcy* (2010)

17

48 Cal.4th 257, 284 [106 Cal.Rptr.3d 459, 226 P.3d 949]); such waiver or abandonment may be inferred from a defendant's conduct. (*Id.* at pp. 284-285; *People v. Stanley* (2006) 39 Cal.4th 913, 929 [47 Cal.Rptr.3d 420, 140 P.3d 736]; *People v. Dunkle*, *supra*, 36 Cal.4th at p. 909.)" (*People v. Trujeque* (2015) 61 Cal.4th 227, 262-263.)

### 3. Analysis

The Attorney General contends that defendant forfeited his *Faretta* contention on appeal by his statements that he was withdrawing his request to represent himself and was "very satisfied" with appointed counsel, which statements, according to the Attorney General, constituted a waiver or abandonment of the *Faretta* issue in the trial court. Defendant asserts that his statement that he "want[ed] to withdraw that" was vague and did not explicitly refer to his denied requests to represent himself.

Defendant's statement that he "want[ed] to withdraw that," when read in the context of the proceedings relevant to his *Faretta* requests, was a reference to his repeated requests to represent himself, as accurately reflected in the minute order for the proceeding at which his statements were made. As the record reflects, on August 6 and again on August 12, 2013, defendant made repeated requests to represent himself that were denied as untimely by two different judges. Defendant's requests were based primarily on his defense counsel's refusal to enter a plea of not guilty by reason of insanity.[7] On August 13, 2013, defendant appeared before a third judge and the issue of his insanity plea was discussed at length between the trial court and defense counsel during in camera proceedings, as well as proceedings conducted in open court. At the end of those discussions, the trial court, with defense counsel's acquiescence, allowed defendant to enter a plea of not guilty by reason of insanity and continued trial 90 days. It was at that point that plaintiff made his statements. Because defendant's prior *Faretta* requests were centered mainly around his counsel's refusal to enter an insanity plea, once the trial court allowed that plea and continued the trial, defendant's statement that he

---

[7] Defendant also complained that his trial counsel tried to coerce him to accept a plea bargain and had refused his request for a copy of the police report.

"want[ed] to withdraw that" could only have referred to his prior requests to represent himself.

Defendant did not renew his *Faretta* request after his statements and instead acquiesced in appointed counsel's representation throughout trial. Therefore, his statements about withdrawing his *Faretta* requests and his satisfaction with appointed counsel constituted a waiver or abandonment in the trial court of his right to represent himself. Given that waiver or abandonment in the trial court, defendant cannot demonstrate on appeal that he was prejudiced by the denials of his prior *Faretta* requests.

## B. Requiring Defendant to Testify Out of Order

### 1. Background

After Officer Mullane finished testifying in the prosecution's case and before the time scheduled for Officer Rolens's testimony to begin, the following exchange took place between and among the trial court, defense counsel, and defendant concerning whether defendant intended to testify and, if so, whether he was willing to testify during the time remaining before Officer Rolens's scheduled arrival at court.

"The Court: People's next witness [Officer Rolens] [is the prosecution's]—final witness; is that correct? [¶] [Prosecutor]: Yes, your Honor. [¶] The Court: -- [He i]s available at 1:30 this afternoon and that's fine. The Court was certainly put on notice in advance of that scheduling conflict if you will. [¶] But we have roughly a good solid hour and fifteen minutes of Court time this morning, which we can make good use of it in the event there is a defense witness that is available to testify between now and noon. [¶] So we can certainly accommodate the defense and call a witness out of order if you have one available [defense counsel]. [¶] [Defense Counsel]: Other than [defendant], I do not this morning. [¶] The Court: All right. Does your client definitely—has he definitely decided to offer testimony? [¶] [Defense Counsel]: Yes, he has. [¶] The Court: Okay. Then we can certainly accommodate his testimony right away. If you desire to do that, [defense counsel], I'll certainly allow that to happen. [¶] [Defense Counsel]: *Certainly*.

19

[¶] The Court: Okay. [Defendant], before we proceed, and, obviously, allow you to testify on your own behalf, I want to make abundantly clear for the record that you have an absolute right not to testify. You cannot be compelled to testify as a witness in this case. Do you understand that right? [¶] The Defendant: Yes, your Honor. [¶] The Court: Okay. Now, if you elect to testify as to what—which is what I'm hearing from your lawyer—that means not only do you understand your right to remain silent, but you're also waiving and giving up that right so on your own you can offer testimony. [¶] So do you understand, waive and give up your right to remain silent so you can offer testimony before this jury? [¶] The Defendant, Well, not -- [¶] The Court: I just need to hear a yes or a no. I don't need to hear an explanation. That's not what I'm asking. Are you indeed going to testify? [¶] The Defendant: *Yes, your Honor, but not now*. [¶] The Court: Okay. That's all I need to hear is that you plan on testifying. And, forgive me, it's not that I'm not interested in what you have to say. I just don't want you to mention anything beyond the Court's inquiry which could affect your right or your privilege against self-incrimination. [¶] I'm going to give you a few minutes to discuss this with your lawyer because I get the impression from you that you're somewhat equivocal in your giving up of your right to remain silent, that you feel should be conditional in some respect, and that is not the case. [¶] . . . [¶] The court has given [defendant] some additional time to consult with counsel in order for me to inquire as to whether or not he understands his right to remain silent, and he's unequivocally waiving and giving up that right so he can offer testimony in this case. [¶] So, [defense counsel], I'll allow you to speak on his behalf. Now that he's had some additional time to consider his options, how does the defense wish to proceed? [¶] [Defense Counsel]: *The defense wishes to proceed by having [defendant] testify, which is his right*. And I've explained to him the repercussions as far as bringing into evidence prior convictions or moral turpitude, and the limitation of what he would be testifying to in the guilty phase versus the sanity phase. I've explained that to him. I don't believe there's—I'm not sure if it's a level of comprehension or stubbornness, but I've tried to explain. [¶] *Additionally, he's concerned about testifying now*. *He prefers to testify at the close of the case*, and so

20

that's where we are at this time. [¶] The Court: Okay. And again, [defendant], you can't put conditions on your testimony. Either you want to testify or you don't. And we have available time this morning, so if you wish to testify, now is your time. If not, then you certainly can exercise your right to remain silent and not testify, but I will not allow you to put conditions on your availability to testify. [¶] So, [defendant], is it your desire to testify, yes or no? [¶] The Defendant: Yes, your Honor. [¶] The Court: Okay. You got it. Then let's bring in our jury and let's proceed." (Italics added.)

###### 2. Analysis

Defendant contends that by compelling him to testify in the middle of the prosecution's case, the trial court violated his Fifth Amendment right against self-incrimination, as well as his Sixth Amendment right to assistance of counsel. According to defendant, the trial court's order requiring him to testify out of order deprived him of the right to hear the entirety of the prosecution's case before deciding whether to waive his right against self-incrimination and testify, and further deprived him of the right to his trial counsel's assistance and advice before making that decision. (*Brooks v. Tennessee* (1972) 406 U.S. 605, 607-609; *Geders v. United States* (1976) 425 U.S. 80, 88-89.) Moreover, defendant contends that the error was structural because it affected the framework within which the trial proceeded and was therefore reversible per se, citing *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 and *Yarborough v. Keane* (2d Cir. 1996) 101 F.3d 894, 897. In addition, defendant urges that even if the error is subject to a harmless error analysis under the federal Constitutional standard set forth in *Chapman*,[8] the prosecution cannot show that the error was harmless beyond a reasonable doubt.

Assuming, without deciding, that the trial court's conduct in forcing defendant to testify before the prosecution had finished its case constituted the error claimed, we conclude that any such error was harmless. In doing so, we reject defendant's assertion that the error in issue was structural and therefore reversible per se. As defendant

---

[8]     *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

21

concedes in his opening brief, the United States Supreme Court has not held that the asserted error in issue is structural. Moreover, because defendant fails to cite any state appellate decision holding that such error is structural, he implicitly concedes that there is no appellate authority directly on point to support his assertion of structural error. Absent such authority, we conclude that the claimed error is subject to a harmless error analysis and that, under either the federal *Chapman* standard or the state law standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, no prejudice can be shown.

Using the harmless error standard articulated in *Chapman, supra,* 46 Cal.4th 818, defendant claims he was prejudiced by the trial court's order requiring him to testify before Officer Rolens testified because, if he had heard Officer Rolens's testimony, he either would have testified differently[9] or would not have testified at all. According to defendant, if he testified differently or did not testify, a reasonable juror could have concluded that he was not guilty of one or more of the charged crimes.

Contrary to defendant's assertion, it is not reasonably likely that he would have testified differently or would have chosen not to testify. Following Officer Mullane's testimony, defendant was unequivocal about his intent to testify on his own behalf, a fact that suggests he would have testified regardless of whether the prosecution had completed its case. Moreover, his testimony did not rebut directly Officer Mullane's version of the events of April 10, 2012. To the contrary, defendant conceded that he did not remember much about the police pursuit that night because he was heavily intoxicated—due to his consumption of prescription drugs, illegal drugs, and alcohol— and he was suffering from delusions. That testimony did not relate to defendant's conduct on the night of the pursuit, but rather related to the issue of his capacity to form the specific intent and acquire the knowledge necessary for the commission of certain of the charged crimes. Without some or all of that testimony, defendant would have had no defense or a much weaker defense to the charged crimes. In addition, Officer Rolens's testimony was largely duplicative of the testimony provided by Office Mullane, and

---

[9]     Defendant does not explain how he would have changed or adjusted his testimony, in a truthful manner, in response to the testimony of Officer Rolens.

served primarily to corroborate Officer Mullane's version of the events of April 10, 2012. Thus, even if defendant had heard Officer Rolens's testimony, there was nothing about it that likely would have changed the way defendant testified. Given the nature of defendant's testimony and his expressed desire to testify on his own behalf, it is highly unlikely that his testimony would have changed at the close of the prosecution's case or that he would have changed his mind and declined to testify.

Even if defendant had changed his testimony or refused to testify, the prosecution's case against him was overwhelming. Officers Mullane and Rolens, who were both in uniform driving marked patrol cars with their red lights and sirens activated, observed first hand defendant's erratic and reckless driving during the pursuit. They also heard there was a witness report of someone in a car matching the description of defendant's car brandishing a shotgun; they both heard a shotgun report from defendant's car during the pursuit at the same location; Officer Rolens saw the shotgun pointing back toward him; and, after defendant crashed into the Jaguar, Officer Mullane recovered a loaded shotgun from defendant's car, along with expended shotgun shell casings and live shotgun rounds. In addition, both officers observed defendant's noncompliant behavior and defiant gestures after he emerged from his wrecked vehicle with a beer in his hand. Therefore, given the state of the prosecution's evidence—which, under defendant's theory, the jury would have considered without any or at least all of defendant's testimony—no reasonable juror could have concluded that defendant was not guilty of one or more of the charged crimes. Accordingly, the claimed error was harmless beyond a reasonable doubt.

**C.** **Ineffective Assistance of Counsel for Failure to Exclude Hearsay in Psychiatric Records**

*1.* *Background*

During his testimony, defendant's expert, Haig Kojian, was asked about a statement defendant made to someone while incarcerated at the Twin Towers

Correctional Facility two days after his arrest. The cross-examination and redirect questioning on this issue was as follows: "Q. The Mental Records reflect the defendant's statement as to what he was trying to do on the night of April 10th, 2012, correct? A. Statement to mental health individuals at [Twin Tower Correctional Facility]? Q. Correct. A. Yes, that's true. Q. And the defendant's statement was that he was trying to make the police mad so they would shoot him, correct? A. That was in the record, yes. [Prosecutor]: Thank you. I have no further questions. The Court: Any redirect on those issues? [Defense Counsel]: Q. As far as the forensic—Twin Towers, the statement: make the police shoot him so that what? So he would die or – A. Well, I think what counsel is referring to was a statement in the Twin Towers mental health records, which wasn't made to me, just to be clear. It was part of the discovery that I reviewed. There was an alleged statement made at the time that was memorialized in the records from [Twin Towers Correctional Facility] that I reviewed which says something to the effect that he was trying to make the police mad enough to shoot him. Something to that effect. That's not a direct quote. Q. Okay. So there's more to it than just that one little sentence. A. I can check my notes and I'll give you the exact quote if you want. [Defense Counsel]: May he check, your Honor? The Court: Absolutely. The Witness: Thank you sir. Okay. So according to the record on April 12th, 2012, which is correct, it's two days after the date of the alleged offense, at 0438 hours, in terms of the—with respect to the alleged matter, the subject had allegedly indicated, 'I tried to make police mad so that they would shoot me to kill me.' [Defense Counsel]: And that is two days after the event? A. That -- Q. After the arrest? A. That note was dated April 12, 2012. Again, it wasn't made to me. He made it to somebody else. I can go through this to see who he made it to allegedly. But it was memorialized, documented in the records. And that was a date stamp. Now, when he actually made that statement to whoever it was that generated that report, I don't know. A. That I don't know. It could have been. . . . And it's difficult to tell when the statement was made versus when that particular sheet was generated. And so all I know is that in my notes I listed that date and time that I just

24

indicated, but I don't know when he made that statement. I don't know at what time chronologically that statement can be attributed to."

### 2. Legal Principles

"In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington*, *supra*, at p. 687; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus. (*Id.* at pp. 266-267.)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

### 3. Analysis

Defendant contends that his trial counsel provided ineffective assistance of counsel by failing to object to the hearsay statement from the records of the Twin Towers Correctional Facility regarding his desire to have police officers kill him. According to defendant, although his expert was entitled to rely on the hearsay statement in forming his opinion (Evid. Code, § 801, subd. (b)), the statement was inadmissible to prove the

truth of the matter asserted therein or that defendant made the statement. Therefore, defendant argues his trial counsel should have requested a limiting instruction[10] advising the jury not to consider the statement for the truth of the matter asserted or to prove the defendant made the statement. Defendant maintains his trial counsel's failure to request such an instruction fell below the objective standard of reasonableness under prevailing professional norms and that there is no satisfactory explanation for counsel's failure in that regard.

Assuming, without deciding, that the statement in issue was inadmissible hearsay that could have been subject to a limiting instruction, we cannot conclude from the record that there was no rational tactical purpose for defense counsel's failure to request such an instruction. Defendant's trial counsel could have reasonably concluded that such an instruction may have caused the jury to focus more attention on the statement than the jury might otherwise have given the statement without the instruction. Accordingly, defendant has not carried his burden of showing that defense counsel's alleged failure to act had no rational tactical purpose and his claim of ineffective assistance of counsel would therefore be more appropriately raised in a petition for habeas corpus.

### D. Inadequate Instruction on Voluntary Intoxication, Omission of Instruction on Mental Impairment, and Ineffective Assistance of Counsel

Defendant contends that the trial court erred in instructing the jury on voluntary intoxication. According to defendant, the trial court's instruction on voluntary intoxication as to count 1—evading a police officer with willful disregard—was inadequate because, although it specified that voluntary intoxication could negate the

---

[10]    CALCRIM No. 360 is a limiting instruction that advices the jury that hearsay statements repeated in an expert's testimony can be considered "only to evaluate the expert's opinion" and cannot be considered as "proof that the information contained in the statement is true." (CALCRIM No. 360.)

26

requisite specific intent, i.e., intent to evade, it failed to specify that voluntary intoxication could also negate the requisite knowledge element of count 1, i.e., knowledge that defendant's pursuers were police officers. In addition, defendant contends that the trial court erred by failing to instruct on voluntary intoxication as to counts 2 and 9—assault with a firearm on a police officer and resisting, delaying, or obstructing a police officer because each of those counts also had a knowledge component relating to police officers. In the alternative, defendant contends that he received ineffective assistance of counsel based on his trial counsel's failure to request that the trial court modify the voluntary intoxication instruction as to count 1 to specify that such intoxication could also negate the knowledge requirement of that count 1; failure to request an adequate voluntary intoxication instruction as to counts 2 and 9; and failure to request a mental impairment instruction as to counts 1, 2, and 9.

### 1. Background

During the jury instruction conference with counsel, the trial court stated: "Then we have [CALCRIM No.] 3426,[11] voluntary intoxication applicable only to specific intent crimes, which is Count 1." The trial court then asked counsel if there were any objections to that instruction as to count 1. Defendant's trial counsel did not object or

---

[11] The version of CALCRIM No. 3426 given by the trial court reads: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence in deciding whether the defendant acted with the intent to evade a peace officer as charged in Count 1. [¶] A person is *voluntarily intoxicated* if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of evading a peace officer with wanton disregard for safety, or misdemeanor evading a peace officer, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to evade a peace officer. If the People have not met this burden, you must find the defendant not guilty of evading a peace officer with wanton disregard and the lesser offense of misdemeanor evading a police officer. [¶] You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to the remaining crimes charged in this case or remaining lesser offenses."

27

request any modification to the instruction.  In addition, defendant's trial counsel did not request a voluntary intoxication instruction as to either count 2 or count 9.  And defendant's trial counsel did not request a mental impairment instruction as to counts 1, 2, or 9.

### 2.   *Analysis*

#### a.   Trial Court Error

Defendant's contention that the trial court's voluntary intoxication instruction as to count 1 was inadequate has been forfeited.  The trial court's instruction was a correct statement of the law, even though it did not address specifically the knowledge element of count 1.  Therefore, if defendant determined that a modification to the instruction was necessary to address specifically the knowledge element of count 1, it was incumbent upon his trial counsel to request such a modification.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1022-1023, ["while the court may review unobjected-to instruction that allegedly implicates defendant's substantial rights, claim that instruction, correct in law, should have been modified 'is not cognizable, however, because defendant was obligated to request clarification and failed to do so'"], quoting *People v. Guerra* (2006) 37 Cal.4th 1067, 1134.)  The failure of his trial counsel to do so forfeited any claimed error on appeal.

Defendant's contention that the trial court erred by failing to instruct on voluntary intoxication as to counts 2 and 9 has also been forfeited.  As defendant concedes, the trial court did not have a sua sponte duty to instruct on voluntary intoxication.[12] (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)  Rather, the burden was on defendant to request that those instructions be given as to those counts.  (*Ibid.*)  Therefore, the failure of

---

[12]   Similarly, the trial court had no sua sponte duty to instruct on mental impairment. (*People v. Ervin* (2000) 22 Cal.4th 48, 91.)

28

defendant's trial counsel to request such instructions resulted in a forfeiture of the issue on appeal. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778-779.)

b. Ineffective Assistance of Counsel

Defendant's assertions of ineffective assistance of counsel as to the voluntary intoxication and mental impairment instructional issues fail for reasons similar to those that caused us to reject his earlier assertion of ineffective assistance. Based on the legal principles that control our analysis of a claim of ineffective assistance of counsel discussed above, it is defendant's burden to demonstrate that there was no tactical reason for his trial counsel's failure to request the instructions in issue. Here, the instructions on voluntary intoxication and mental impairment are pinpoint instructions and the decision to request them as to any given count is presumed to fall within the broad range of professional competence. Because the record sheds no light on why counsel did not request the instructions and we cannot conclude that there can be no satisfactory explanation for counsel's failure to act, the matter is more appropriately addressed in a petition for a writ of habeas corpus.

Moreover, even assuming defense counsel's failure to request instructions on voluntary intoxication and mental impairment constituted ineffective assistance, any such error was harmless. The court in *People v. Larsen* (2012) 205 Cal.App.4th 810 explained that [t]he omission of CALCRIM No. 3428[13] [which is a pinpoint instruction similar to the involuntary intoxication instruction in CALCRIM No. 3426] could not have misled

---

[13] CALCRIM No. 3428 provides: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: _____ *<insert specific intent or mental state required, e.g., 'malice aforethought,' 'the intent to permanently deprive the owner of his or her property,' or 'knowledge that ...'>* . If the People have not met this burden, you must find the defendant not guilty of _____ *<insert name of alleged offense>*"

29

the jury as to the intent element of any of the charged crimes or lesser included offenses. The jury instructions as a whole correctly stated applicable law and instructed on necessary elements. "CALCRIM No. 3428 [like CALCRIM No. 3426] does not delineate or describe an element of an offense. It is a pinpoint instruction relating particular facts to a legal issue in the case." (*People v. Larsen, supra,* 205 Cal.App.4th at p. 830.)

The jury in this case was properly instructed as to all elements of counts 1, 2, and 9. Nothing in the instructions prevented the jury from considering defendant's evidence of his intoxication and mental issues in determining intent and knowledge during deliberations. The juror's were well aware from defendant's testimony that he was extremely intoxicated and that he claimed to have seen Satan and was hallucinating about his prior military experience, believing the police officers were soldiers. Thus, the omission of CALCRIM Nos. 3426 and 3428 could not have mislead the jury on the issues of intent and knowledge.

In addition, as discussed above, there was strong, credible, and corroborating evidence of defendant's guilt on count 1, 2, and 9 with respect to both knowledge and intent, much of which was uncontradicted by defendant's testimony. Two of the officers involved in the primary and secondary pursuit of defendant's vehicle—who were both in uniform in marked patrol vehicles with lights and sirens activated—described his reckless driving while under the influence, heard at least one gun shot from defendant's vehicle, described his belligerent, noncooperative behavior following the collision with the Jaguar, and recovered a loaded shotgun, expended shotgun shells, and live, unexpended shotgun rounds from defendant's vehicle. Given the strength of the evidence showing defendant's guilt on counts one, two, and nine, defendant did not "suffer prejudice to a reasonable probability, that is, a probability sufficient to undermine the outcome" of his trial on counts 1, 2, and 9. (*People v. Carter, supra,* 30 Cal.4th at p. 1211.)

## E.      Cumulative Error

Defendant contends that the cumulative effect of the erroneous admission of inadmissible hearsay during his expert's testimony and the instructional errors or omissions warrants reversal of the convictions on counts 1, 2, and 9.  As explained above, however, the claimed errors either did not occur or they were harmless.  Therefore, we reject defendant's assertion of cumulative error.

## F.      Directed Verdict on Insanity Defense

### 1.      Background

Following the jury's guilty verdict, the trial court held a bifurcated trial on defendant's plea of not guilty by reason of insanity.  Defendant was the only witness to testify on his behalf.  Following his testimony, the trial court directed a verdict against defendant on the grounds that there was insufficient evidence that defendant suffered from a mental disorder.  The trial court explained its ruling as follows:  "The Court:  The issue that I have is whether or not there's sufficient evidence in the record upon which the jury can find a preponderance of the evidence that [defendant] suffers from a mental illness or a mental defect or disorder that coupled with his substance abuse could meet the criteria for legal insanity for purposes of a jury to determine.  [¶]  That's the problem that I have here because the evidence is in and that's what it is.  What I gather from [defendant] is certainly there's substance abuse in his history and perhaps even on the date in question, including alcohol consumption to excess.  [¶]  But the law requires more than just simply that, it requires a medical disorder or defect.  And [I] understand [that defendant] in his own words . . . suffers from anxiety and depression.  But that alone is not mental illness or defect as a matter of law.  [¶]  And even coupled with the substance abuse and alcohol abuse that he has mentioned, still doesn't reach the level of legal insanity for purposes of even a jury to decide.  [¶]  So my concern is whether or not I can legally allow the jury even to receive this case based upon the insufficiency of the

31

evidence that I have before me. [¶] It would have been different, [defendant], if you could have produced an expert to say, yes, indeed, you suffer from a—some type of mental disorder or defect or illness. There's just no evidence in the record of that. [¶] So, [defense counsel], what are your thoughts about this issue? [¶] [Defense Counsel]: Well, according to my research, the court, pursuant to a particular case I think in 2003, although it's a novel area, the court does have the power and authority to grant its own 1118.1. And the standard of proof would be the preponderance of the evidence. And if that's not been presented for your Honor's satisfaction, I believe the case law supports, I think, what you're ultimately getting to. [¶] The Court: Well, the case that I think you and I are both referring to—and you're right it is a 2003 matter—its People versus Ceja, CEJA, cited as 106 Cal.App.4th page 1071, specifically at page 1089 where the court concluded, based upon analysis of case law—and this case is still current law. It's still valid. And I'll read the finding of the holding into the record. [¶] And again, it was a case very similar to what we have here. But even in the Ceja case there was expert testimony introduced during the sanity phase and here we don't even have that. But in the Ceja matter the court concluded that: 'There was no Constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea. As recognized by Justice Brown—citing another case called *Hernandez*—and the prior cases involving double jeopardy, courts retain an inherent power to remove an affirmative defense from the jury where there is no evidence to support it.' So the court does have the authority, but it's not an 1118 analysis. That only pertain to directing a verdict for the defendant, so that's not the analysis. [¶] . . [¶] And that's the way I'm going to find. I'm going to remove this from the jury and find as a matter of law there is insufficient evidence for the jury to resolve the [sanity] issue . . . because there is just simply insufficient evidence presented in the record at this point."

### 2. *Authority to Direct Verdict*

Defendant contends that the trial court denied his due process and jury trial rights by directing a verdict of insanity because only the jury was empowered to rule on the factual issue of his sanity. The Attorney General argues that defendant has forfeited the issues of whether the trial court denied him due process and violated his rights to a jury trial by failing to raise those issues in the trial court, citing *People v. Stowell* (2003) 31 Cal.4th1107, 1114 and *People v. Garceau* (1993) 6 Cal.4th 140, 173. Defendant contends that because the trial court was bound by the holding in *People v. Ceja* (2003) 106 Cal.App.4th 1071, 1084-1085 (*Ceja*) confirming a trial court's authority to direct a verdict of sanity, it would have been futile to object in the trial court, citing *People v. Severence* (2006) 138 Cal.App.4th 305, 314-315.

We do not need to resolve whether defendant forfeited his challenges to the trial court's authority to direct verdict on the sanity issue because even if the issue has been preserved for appeal, there is no merit to those challenges. Defendant concedes that there is, not one, but three appellate court decisions that recognize a trial court's discretionary authority to direct a verdict against a defendant in a trial of a sanity defense. (See *Ceja*, *supra*, 106 Cal.App.4th 1071; *People v. Severence* (2006) 138 Cal.App.4th 305; and *People v. Blakely* (2014) 230 Cal.App.4th 771.) Defendant also concedes that the Supreme Court has not addressed the issue.

Nevertheless, defendant urges us to ignore established case law on this issue because the three cases in issue were wrongly decided. According to defendant, the premise of these cases—a trial court may direct a sanity verdict because the defendant has the burden of proof on that affirmative defense—is flawed. Defendant asserts that the assignment of the burden of proof has nothing to do with the core issue of who determines the factual issue of sanity. Because section 25, subdivision (b) and section 1026, subdivision (a) assign that factual question to the jury and no statute authorizes a trial court to direct sanity verdicts, defendant concludes that the issue of sanity must always be determined by the jury.

33

We are not persuaded that the three appellate decisions in issue, which recognize a trial court's discretion to direct a verdict of sanity, were wrongly decided. We therefore choose to follow established precedent on this issue and conclude that the trial court did not violate defendant's due process and jury trial rights by directing a verdict on the sanity issue.

### 3. *Substantial Evidence*

Defendant maintains that even if the trial court had the power to direct a verdict, it nevertheless erred by finding that there was no substantial evidence to support an inference that defendant was insane at the time he committed the crimes. According to defendant, his testimony about his physical injuries and his mental issues, including anxiety, depression, and drug and alcohol addiction, when considered together with his expert's testimony during the guilt phase that his mental and addiction problems could have made it difficult for him to form specific intent, constituted substantial evidence that supported an inference of insanity.

The principles governing the trial of an affirmative defense of insanity are well-established. "Under California law, if a defendant pleads not guilty and joins it with a plea of not guilty by reason of insanity, the issues of guilt and sanity are tried separately. Penal Code section 1026, subdivision (a), provides that in such circumstances, 'the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court. In that trial, the jury shall return a verdict either that the defendant was sane at the time the offense was committed or was insane at the time the offense was committed.' [¶] Although guilt and sanity are separate issues, the evidence as to each may be overlapping. Thus, at the guilt phase, a defendant may present evidence to show that he or she lacked

the mental state required to commit the charged crime. (*People v. Saille*[, *supra,*] 54 Cal.3d [at pp.] 1111-1112; Pen. Code, § 21, 28, 29.) A finding of such mental state does not foreclose a finding of insanity. Insanity, under California law, means that at the time the offense was committed, the defendant was incapable of knowing or understanding the nature of his act or of distinguishing right from wrong. (Pen. Code, § 25, subd. (b); *People v. Skinner* (1985) 39 Cal.3d 765, 776-777 [217 Cal.Rptr. 685, 704 P.2d 752 [construing Pen. Code, § 25, subd. (a), as providing that defendant may be found insane if he did not know the nature and quality of his act *or* if he did not know the act to be morally wrong].)" (*People v. Hernandez* (2000) 22 Cal.4th 512, 520-521.)

Insanity is a plea raising an affirmative defense to a crime charged. (*People v. Hernandez, supra,* 22 Cal.4th at p. 522.) The burden is on the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense. (*Id*. at p. 521.) A defendant must show that he suffered from a "mental condition which render[ed] him] incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act." (*People v. Kelly* (1973) 10 Cal.3d 565, 574.)

As discussed, defendant was the only witness to testify on his behalf during the sanity phase. As a result, there was no expert testimony on the issue of whether he was able to appreciate the nature and quality of his acts or was not able to distinguish right from wrong in relation to those acts. Moreover, the only mental conditions that defendant claimed he was suffering from were anxiety and depression. He also claimed to be addicted to alcohol and drugs. But anxiety, depression, and addiction cannot be the basis for a finding of insanity. "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or an abuse of, intoxicating substances." (§ 29.8) Likewise, the fact that defendant had suffered injuries to his head in the past which caused him to become unconscious and had surgery to treat one of those injuries did not support a reasonable inference that defendant did not appreciate the nature and quality of his acts or was incapable of distinguishing

35

right from wrong in relation to those acts on the night he committed the charged crimes. And although defendant claimed he saw Satan and was hallucinating on the night of his crimes, those facts were not related to his ability to appreciate the nature and quality of his acts or to distinguish right from wrong.

Given the conclusory nature and limited extent of defendant's testimony during the sanity phase, the trial court correctly concluded that defendant had not presented substantial evidence that he was legally insane. The trial court therefore did not err in directing a sanity verdict.

### G.    Supplemental Briefing on Sentencing Error

After this matter was fully briefed, we granted defendant leave to file a supplemental brief on a sentencing issue. In his supplemental brief, defendant contends, inter alia, that the five-year sentence enhancement imposed by the trial court pursuant to section 667, subdivision (a) was unauthorized and must be stricken. According to defendant, because the accusatory pleading did not contain a section 667, subdivision (a) allegation and it was not tried and found true or admitted, the trial court could not lawfully impose the five-year sentence enhancement, citing, inter alia, *People v. Mancebo* (2002) 27 Cal.4th 735, 743-744. The Attorney General filed a supplemental letter brief in response agreeing that the five-year sentence enhancement was unauthorized and must be stricken.

In a letter brief filed September 30, 2015, defendant advised this court of the recent decision in *People v. Vizcarra* (2015) 236 Cal.App.4th 422 (*Vizcarra*). Defendant contends that to the extent *Vizcarra* suggests that a sentence enhancement under section 667, subdivision (a) is mandatory and must be imposed by a trial court, it was wrongly decided.

We have reviewed the parties' briefs on this issue and conclude that the five-year sentence enhancement imposed by the trial court was unauthorized and must be stricken

36

because it was not alleged in the accusatory pleading and it was not tried and found true or admitted.

Nothing in the recent decision of *Vizcarra*, *supra*, 236 Cal.App.4th 422 alters our conclusion. That decision involved the legal issues of collateral estoppel and law of the case and whether the trial court abused its discretion in resentencing the defendant. The issue concerning the five-year sentence enhancement under section 667, subdivision (a) to which the court in *Vizcarra* refers was actually decided in a prior unpublished decision in that case. Thus, the published decision in *Vizcarra* cannot be cited for issues that were not necessarily determined in that decision.

## DISPOSITION

The judgment of conviction is affirmed and the matter is remanded to the trial court with instructions to strike the unauthorized five-year sentence enhancement imposed under section 667, subdivision (a) and to resentence defendant in light of the stricken enhancement.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

BAKER, J.

37